## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 29 2020, 10:14 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patrick F. O'Leary
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Peter J. Agostino
Stephanie L. Nemeth
Anderson, Agostino & Keller, P.C.
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Scott Floyd,

*Appellant-Plaintiff,*

v.

St. Joseph County,

*Appellee-Defendant*

May 29, 2020

Court of Appeals Case No.
19A-CT-2406

Appeal from the St. Joseph Circuit Court

The Honorable John E. Broden, Judge

Trial Court Cause No.
71C01-1608-CT-394

**Baker, Judge.**

After having been terminated from his job on October 15, 2015, Scott Floyd filed suit against his employer, St. Joseph County (St. Joseph), alleging that St. Joseph unlawfully discharged him in retaliation for filing a worker's compensation claim. A jury later returned a verdict in favor of St. Joseph. Now, Floyd appeals, arguing that the trial court erred by (1) denying his motion for relief from judgment because St. Joseph committed discovery misconduct; and (2) refusing to give a proffered final jury instruction. Finding no error, we affirm.

# Facts

Floyd worked for St. Joseph as a heavy equipment operator at the Riverside Garage in South Bend. By the time of his termination, Floyd had been subject to various disciplinary actions and was close to being discharged. Floyd was operating under a Last Chance Agreement with his local union, which required specific rules and regulations with corresponding points for disciplinary actions attached to each regulation violation. Thus, by this time, Floyd understood that any further violation of the rules would lead to his termination. One such rule violation under the Agreement included a failure to report damage to any work equipment. On September 29, 2015, Floyd filed a worker's compensation claim after sustaining a workplace injury to his right hand and wrist.

On October 7, 2015, during his shift, Floyd operated Truck 124 to haul dirt from the Clay Fire Station to the Central Garage. Supervisor Edward Hawthorne testified that Floyd was, in fact, assigned to Truck 124 on that day,

that Truck 124 was not damaged that morning, and that he assisted Floyd with installing a tail gate on Truck 124. Michael Jaffe similarly testified that he saw Floyd driving away in Truck 124 on October 7, 2015, and that the truck was not damaged.

[4] However, the next day, on the morning of October 8, 2015, supervisor Mark Lewandowski discovered damage to Truck 124 and the truck's spindle. Lewandowski took a photograph of the truck and sent it to his supervisor, Chip Porter. Porter then asked Hawthorne to obtain the job assignment/inspection sheet to see who last operated Truck 124. Porter authorized moving the damaged Truck 124 and its spindle to the Central Garage, where Porter took additional photos of the damage on October 13, 2015.

[5] Porter then asked Floyd to attend a meeting at the Central Garage that same day. Porter requested that Jim Szucs, a union representative, be present for the meeting. During the meeting, Porter informed Floyd that Porter and other employees discovered damage to Truck 124 and that Floyd was to be disciplined for failing to report the damage. In support of his decision, Porter presented Floyd with his coworkers' statements and photos of the damage. Floyd admitted that there was damage to Truck 124, that an incident occurred on October 7, 2015, and that that incident may have caused damage to Truck 124. At no point in time was the topic of a worker's compensation claim ever discussed. Porter gave Floyd the option of resigning, which Floyd refused to do. Therefore, on October 15, 2015, Porter terminated Floyd for failing to report damage to work equipment, a clear violation of his Last Chance Agreement.

[6] Soon thereafter, Floyd initiated a grievance regarding his termination, which resulted in a review hearing before St. Joseph's Auditor, Michael Hamann. During the hearing, Floyd did not dispute that Truck 124 was damaged on October 7, 2015, nor did he dispute that no one had ever mentioned or referenced his September 2015 worker's compensation claim in connection with his eventual termination. On January 20, 2016, Hamann issued his decision affirming Floyd's termination, finding that "[St. Joseph] did, in fact, have just cause to terminate the employment of Scott Floyd." Appellant's App. Vol. II p. 26.

[7] On August 25, 2016, Floyd filed suit against St. Joseph, alleging that St. Joseph had terminated him in retaliation for filing the September 29, 2015, worker's compensation claim. The trial court set the discovery deadline for January 31, 2019. As part of the discovery process, Floyd sent St. Joseph two sets of interrogatories. Interrogatory Number 2-3 read as follows:

> Did [St. Joseph] photograph any part of the Truck after [St. Joseph] believed or suspected that the truck had been damaged by [Floyd]? If so, if you are willing to do so, please produce copies of all photographs with your answers to these interrogatories.

*Id.* at 73. St. Joseph responded to this interrogatory by saying, "Yes, see attached four (4) photographs," and submitting the four photos of damage that Porter had presented to Floyd. *Id.*

[8] Another interrogatory, Interrogatory Number 2-5, read as follows:

Did [St. Joseph] photograph any part of the Truck prior to [Floyd's] termination? If so, if you are willing to do so, please produce copies of all photographs with your answers to these interrogatories.

*Id.* at 74. St. Joseph responded to this interrogatory by saying "Yes, they are the same pictures referenced in Interrogatory No. 2-3, above." *Id.* Floyd did not object or respond to St. Joseph's answers to either of these interrogatories.

[9] Additionally, Floyd sent St. Joseph multiple requests for production of certain documents. In response to request number 11 (Request 11), which asks for "All documents and communications that mention or refer to [Floyd] in any manner," St. Joseph stated the following:

Objection. This Request is vague, ambiguous, overly broad and unduly burdensome. Without waiving said objection, [St. Joseph] has produced at Tab 2 [Floyd's] employee personnel file.

Tr. Ex. Vol. IV p. 33. As part of Floyd's personnel file, St. Joseph compiled approximately 343 pages of documents, among them records from Floyd's prior disciplinary actions, written statements from Floyd's coworkers, the daily job assignment sheet for October 7, 2015, and a copy of Floyd's Last Chance Agreement. St. Joseph did not provide photographs because it had already submitted them to Floyd in response to Floyd's interrogatories. Floyd did not respond to St. Joseph's objection or the documents it submitted. Moreover, at no time did Floyd request clarification or supplementation of the materials that St. Joseph submitted; he also did not claim that the materials themselves were insufficient.

[10] On May 15, 2019, Floyd filed a "Comprehensive Motion," appellant's app. vol. II p. 131, which included a request to continue the jury trial beyond June 18, 2019, and a request that St. Joseph supplement its response to Request 11. Specifically, Floyd wanted St. Joseph to clarify that it had looked for and could not find a certain document— a job and equipment inspection sheet from October 7, 2015. St. Joseph argued that such a request was unwarranted because Floyd had never specifically requested that log and waited until after January 31, 2019, to do so. Following a June 4, 2019, hearing, the trial court denied Floyd's "Comprehensive Motion" in whole. The matter then proceeded to trial.

[11] At the conclusion of Floyd's June 18, 2019, jury trial, the trial court provided both parties with proposed jury instructions. Floyd tendered the following instruction for consideration:

> If a party fails to produce documents under the party's exclusive control, you may conclude that the documents that the party could have produced would have been unfavorable to the party's case.

*Id.* at 15. Floyd argued that this instruction was necessary because St. Joseph failed to submit the job and equipment inspection sheet in response to Request 11. St. Joseph objected, arguing that the trial court had already ruled on this issue in a previous hearing and that such an instruction casts a negative light on St. Joseph's case. The trial court ultimately refused to give Floyd's proffered final jury instruction.

At the end of the trial, the jury returned a verdict in favor of St. Joseph. On August 7, 2019, Floyd filed a motion to correct error and for relief from judgment, on which the trial court did not issue a ruling. Floyd now appeals.

# Discussion and Decision

## I. Discovery Misconduct

First, Floyd argues that the trial court erred by denying his motion for relief from judgment[1] because St. Joseph committed discovery misconduct. Specifically, Floyd contends that St. Joseph prejudiced him during discovery by intentionally omitting or withholding certain evidence.

Indiana Trial Rule 60(B)(3) states that a party may be relieved from a judgment for "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party[.]" "A grant of equitable relief under Indiana Trial Rule 60 is within the discretion of the trial court." *Outback Steakhouse of Fla., Inc. v. Markley*, 856 N.E.2d 65, 72 (Ind. 2006). We review a trial court's ruling on a motion for relief from judgment to determine whether the trial court's decision was clearly erroneous or against the logic and effect of the facts before it and all inferences drawn therefrom. *Barton v. Barton*, 47 N.E.3d 368, 373 (Ind. Ct. App. 2015). It is the movant's burden to

---

[1] It should be noted that the trial court did not, in fact, issue a ruling on Floyd's motion to correct error and for relief from judgment. However, Indiana Trial Rule 53.3(A) states that "[i]n the event a [trial] court . . . fails to rule on a Motion to Correct Error within thirty (30) days after it was heard or forty-five (45) days after it was filed, if no hearing is required, the pending Motion to Correct Error shall be deemed denied."

show that the opposing party committed fraud and that that fraud prevented the movant from fully and fairly presenting his case. *Morgan Cty. v. Ferguson*, 712 N.E.2d 1038, 1046 (Ind. Ct. App. 1999).

[15] Here, Floyd argues that during discovery, St. Joseph purposefully omitted or withheld a specific photograph—the one Lewandowski took on October 8, 2015, and then sent to Porter—and the job and equipment inspection sheet from October 7, 2015. In so doing, according to Floyd, St. Joseph fraudulently concealed important information and, consequently, "sucker[ed] Floyd's counsel into presenting to the jury an erroneous narrative that undermined the jury's confidence in his credibility." Appellant's Br. p. 20.

[16] First, as to the cell phone picture, Floyd posits that "[St. Joseph] led Floyd and his counsel to believe that the 4 photographs comprised all of them and by logical extension, included the photo that Lewandowski claimed to have sent Porter on October 8th." *Id.* at 18. However, Floyd has never shown what the cell phone picture depicted and cannot prove that its existence and use during trial would have benefitted him in any way. At this point, it is pure speculation to say that the cell phone photograph is integral to Floyd's case. Moreover, there is no evidence in the record that St. Joseph purposefully withheld it.

[17] Moreover, the trial court, during the hearing on Floyd's "Comprehensive Motion" and during the trial, elicited testimony from Porter that Porter had had the photo on his cell phone, but that his and Lewandowski's phones had been exchanged over time. Therefore, according to Porter, it was virtually impossible

to retrieve the photo, despite Floyd's multiple requests. It is clear that the trial court found Porter's testimony to be credible because it denied Floyd's motions and allowed the matter to proceed. We find that the trial court did not err in its assessment. St. Joseph did, in fact, turn over photographs of the damaged Truck 124 and complied, to the best of its abilities, with Floyd's myriad requests during discovery. As such, we find that the trial court did not err by denying Floyd's request for relief on this front.

[18] Next, there is the job and equipment inspection sheet. As a reminder, Request 11 asked for "All documents and communications that mention or refer to [Floyd] in any manner." Tr. Ex. Vol. IV p. 33. In lieu of objecting and simply refusing to turn over any evidence, St. Joseph objected and submitted Floyd's entire personnel file, which included written statements, the daily job assignment sheet from October 7, 2015, and a copy of Floyd's Last Chance Agreement. Floyd argues that the 343 pages of his personnel file did not suffice because the inspection sheet was not included.

[19] The problem is that Floyd did not specifically request the job and equipment inspection sheet. Yes, Request 11 is broad in scope, but as St. Joseph correctly points out, "it is not [St. Joseph's] responsibility to complete the discovery for [Floyd]." Appellee's Br. p. 23. And like with the cell phone photo, Floyd cannot demonstrate how omission of the job and equipment inspection sheet prejudiced his case. The onus was on Floyd to be specific in his requests for documents, and the record shows that St. Joseph more than adequately responded by handing over the documents that it did.

[20] Most importantly, Floyd seemingly ignores that he had nearly two and one-half years from the commencement of litigation up until the discovery deadline to obtain this information. After St. Joseph responded to Floyd's interrogatories and requests for documents, Floyd did not seek clarification or supplementation. It was not until May 2019—months after the discovery period had closed—that Floyd sought more information because he suddenly found St. Joseph's discovery responses to be lacking. Floyd has not shown that St. Joseph committed fraud or any other misconduct during the discovery process or that he was prejudiced by St. Joseph's actions.

[21] Thus, in looking at the totality of the circumstances, we find that the trial court did not err by denying Floyd's motion for relief from judgment.

## II. Jury Instruction

[22] Next, Floyd argues that the trial court erred by refusing to give a proffered jury instruction on the spoliation of evidence.

[23] "The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair and correct verdict." *Dawson v. Thornton's, Inc.*, 19 N.E.3d 337, 339 (Ind. Ct. App. 2014). When reviewing a trial court's decision to grant or deny a request for a tendered jury instruction, we consider whether the instruction (1) correctly states the law; (2) is supported by the evidence in the record; and (3) is not covered in substance by other instructions. *Matheny v. State*, 983 N.E.2d 672, 679 (Ind. Ct. App. 2013). We will reverse a

trial court's decision not to give a final jury instruction only if the proposing party would be prejudiced by the failure to give the instruction. *Dollar Inn, Inc. v. Slone*, 695 N.E.2d 185, 190 (Ind. Ct. App. 1998).

[24] The preliminary jury instruction Floyd proffered reads as follows:

> If a party fails to produce documents under the party's exclusive control, you may conclude that the documents that the party could have produced would have been unfavorable to the party's case.

Appellant's App. Vol. II p. 15. This instruction relates to the legal tort of the spoliation of evidence. "Spoliation of evidence is the intentional destruction, mutilation, alteration, or concealment of evidence. If spoliation by a party to a lawsuit is proved, the jury may infer that the missing evidence was unfavorable to that party." *Am. Nat'l Prop. & Cas. Co. v. Wilmoth*, 893 N.E.2d 1068, 1070 (Ind. Ct. App. 2008) (internal citation omitted).

[25] Thus, the instruction itself is not an incorrect recitation of Indiana law, and St. Joseph concedes this point. As such, we must determine whether there is evidence in the record supporting the instruction. We find none. To begin with, the issue of spoliation of evidence was never explicitly brought up during trial. Yes, Floyd alluded to spoliation by claiming St. Joseph had committed misconduct during the discovery process, but that was not the basis of Floyd's lawsuit. Rather, Floyd alleged unlawful termination because of retaliation, and it is the province of trial courts to reject jury instructions that tend to mislead or confuse the jury. *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001). We see no error in the trial court's conclusion that an instruction on spoliation, which was

not at issue in the trial or in any way presented to the jury, would have confused or misled jurors.

[26] Next, the trial court already ruled in a prior hearing that St. Joseph had complied with Floyd's discovery requests and denied a variety of requests by Floyd to have St. Joseph clarify or supplement its responses. It is apparent from these rulings that the trial court was not persuaded that any misconduct had occurred in the first place. And, as we have already examined, the evidence shows that St. Joseph did its best to acquire documents, send adequate responses to interrogatories, and communicate with Floyd at every step of the litigation. A jury instruction on spoliation of evidence would not be warranted given the evidence present in the record. Thus, we find that the trial court did not err when it rejected Floyd's proffered final jury instruction.

[27] The judgment of the trial court is affirmed.

Bradford, C.J., and Pyle, J., concur.